# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
### NORTHWESTERN DIVISION

| | | |
|---|---|---|
| **JODY LISBY,** | } | |
| | } | |
| **Plaintiff,** | } | |
| | } | |
| **v.** | } | **Case No.: 3:16-cv-01835-MHH** |
| | } | |
| **TARKETT ALABAMA, INC.,** | } | |
| | } | |
| **Defendant.** | } | |

## <u>MEMORANDUM OPINION AND ORDER[1]</u>

In this employment action, plaintiff Jody Lisby asserts that defendant Tarkett Alabama, Inc., committed several violations of the Americans with Disabilities Act, 42 U.S.C. § 12101, *et seq.*, in the course of revoking his conditional job offer. He brings four ADA claims against Tarkett: (1) disability discrimination; (2) unlawful medical inquiry; (3) failure to accommodate; and (4) retaliation.

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, Tarkett has moved for summary judgment on all of Mr. Lisby's claims because, according to the company, no genuine issues of material fact exist as to any of his claims, and Tarkett is entitled to judgment as a matter of law. Tarkett asserts that it lawfully revoked

---

[1] The Court is issuing this opinion during a declared national emergency concerning COVID-19. To enable parties to pursue their rights during this emergency, the Court is continuing its work. For information about the timing of appeals, please review the information provided in the conclusion of this opinion. The Court is including this procedural information in each opinion that it issues during the national emergency. The Court expresses no views about potential issues for appeal related to this opinion or about the ripeness of any potential issue for appeal.

Mr. Lisby's job offer because a physician determined that he could not safely perform the job while taking his prescribed methadone. For the reasons stated in this memorandum opinion, the Court will deny Tarkett's motion for summary judgment.

## I.    Summary Judgment Standard

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). To demonstrate that there is a genuine dispute as to a material fact that precludes summary judgment, a party opposing a motion for summary judgment must cite "to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." FED. R. CIV. P. 56(c)(1)(A).

When considering a summary judgment motion, a district court must view the evidence in the record and draw reasonable inferences in the light most favorable to the non-moving party. *Asalde v. First Class Parking Sys. LLC*, 898 F.3d 1136, 1138 (11th Cir. 2018). "The court need consider only the cited materials, but it may consider other materials in the record." FED. R. CIV. P. 56(c)(3). Accordingly, the Court presents the summary judgment evidence in the light most favorable to Mr. Lisby and draws all inferences in his favor.

## II.    Background

Tarkett makes laminate and vinyl flooring in Florence, Alabama and employs approximately 385 employees.  (Doc. 53-14, p. 20, tp. 73).

Mr. Lisby has ADHD, severe anxiety, and chronic lower back pain.  (Doc. 60-15, pp. 1–2, ¶¶ 3–5).  For several years, under a doctor's care, he has taken Adderall to manage his ADHD, benzodiazepines to manage his anxiety, and methadone to treat his pain.  (Doc. 53-10, p. 17, tpp. 66–67; Doc. 60-15, pp. 1–2, ¶¶ 3–5).

Before Mr. Lisby applied for a job at Tarkett, he operated heavy machinery, drove trucks, and handled dangerous chemicals for Lauderdale County.  (Doc. 60-15, p. 3, ¶ 6).  He took Adderall and methadone during his employment with Lauderdale County.  (Doc. 53-10, pp. 60–63; Doc. 60-15, p. 3, ¶ 6).  The methadone did not impair him.  (Doc. 60-15, p. 3, ¶ 6).  He had work-related truck accidents in July 2012 and February 2013.  (Doc. 53-10, pp. 8, 10, tpp. 27, 36).  He tested positive for prescribed amphetamine after each accident.  (Doc. 53-10, pp. 60–63).  Dr. Gary Daniel, an occupational physician, noted a safety concern about Mr. Lisby's driving a truck for Lauderdale County after the 2012 accident, in part because of Mr. Lisby's history of taking prescribed methadone.  (Doc. 53-6, p. 3, ¶¶ 6.a, 6.c).  Dr. Daniel and Dr. McMurry, another occupational physician, expressed a similar concern about Mr. Lisby after the 2013 accident.  (Doc. 53-6, p. 3, ¶¶ 6.b, 6.c).

Lauderdale County fired Mr. Lisby in June 2013.  (Doc. 53-10, p. 13, tpp. 47–

48).  Mr. Lisby filed an EEOC charge alleging discrimination against Lauderdale County that involved Dr. Daniel.  (Doc. 1-1, p. 1; Doc. 53-10, pp. 26–27, tpp. 97–98, 100–02).  At his deposition, Mr. Lisby described his EEOC charge against Lauderdale County as a "discrimination charge against [Dr. Daniel]."  (Doc. 53-10, p. 27, tp. 101).

Mr. Lisby then worked for Freight Car as a welder, forklift driver, and truck driver.  (Doc. 53-10, p. 14, tpp. 49–51; Doc. 60-15, p. 3, ¶ 7).  He took methadone during his employment at Freight Car.  (Doc. 60-15, p. 3, ¶ 7).  Freight Car had no issue with him taking methadone.  (Doc. 60-15, p. 3, ¶ 7).

In May 2015, Mr. Lisby talked with Lori Burchell, Tarkett's human resources generalist, about a newly created position at Tarkett called a cycle counter.  (Doc. 53-10, p. 17, tp. 61).  Ms. Burchell told Mr. Lisby that the cycle counter position was an inventory control position and would involve physically counting inventory and entering counts in a computer.  (Doc. 53-10, p. 17, tp. 62).  Mr. Lisby does not recall Ms. Burchell's telling him that he would be driving a forklift, climbing ladders or stairs, or riding in a bucket affixed to a forklift.  (Doc. 53-10, p. 17, tpp. 62–64).  Tarkett offered Mr. Lisby the cycle counter position conditioned upon him passing a drug test and physical examination.  (Doc. 53-10, p. 16, tp. 59).

Mr. Lisby asked Ms. Burchell if he could visit a doctor other than Dr. Daniel for his preemployment drug test and physical because he "may have trouble" with

Dr. Daniel. (Doc. 53-10, pp. 20, 27, tpp. 73–75, 101–02). Mr. Lisby told Ms. Burchell that he had an "ongoing dispute" with Dr. Daniel concerning discrimination—something "pending . . . like an investigation"—that could cause a "future problem," have "legal ramification[s]," and "could judge negatively towards [Mr. Lisby]." (Doc. 53-10, pp. 20, 27, tpp. 73–75, 101–02). Though he did not use the words "charge" or "lawsuit," Mr. Lisby was referring to his EEOC charge filed against Lauderdale County in which he asserted disability discrimination against Dr. Daniel. (Doc. 53-10, p. 27, tp. 101). Mr. Lisby volunteered to pay for an examination conducted by a different doctor. (Doc. 53-10, p. 20, tp. 74). Ms. Burchell responded that she did not see any problem with Mr. Lisby seeing another doctor, but said that she would have to find out. (Doc. 53-10, p. 20, tp. 74).

Nevertheless, on May 13, 2015, Mr. Lisby went to Dr. Daniel's office for his preemployment drug test and physical. (Doc. 53-10, p. 19, tpp. 70–72; Doc. 53-10, pp. 68–69). Dr. Daniel's nurse practitioner, Sharron Boatwright, conducted the physical and collected a urine sample for the drug test. (Doc. 53-10, p. 19, tpp. 70–72; Doc. 53-10, pp. 68–69).

That day, Tarkett human resources faxed to Dr. Daniel's office a job description for the cycle counter position. (Doc. 53-4, p. 14, tp. 52; Doc. 53-10, p. 65). The job description listed the following as "job duties" for the cycle counter position: "counting all material plantwide"; "conduct[ing] cycle counts plantwide";

and "[completing] data entry in (SAP) system." (Doc. 53-10, p. 65) (capitalization omitted). The job description listed the following as "job requirements" for the cycle counter position: knowing "Excel and [being] computer literate"; being "very organized"; "maintain[ing] good attendance"; "lift[ing] 65+ pounds"; "climb[ing] stairs on a regular basis"; "bend[ing] or stoop[ing] on a regular basis"; "work[ing] from heights"; "work[ing] in a non-heated[,] non-air conditioned environment for at least 8 hours a day"; and "work[ing] for long periods on concrete floors." (Doc. 53-10, p. 65) (capitalization omitted). The job description did not mention forklift work.

On May 17, 2015, Dr. Daniel received the results of Mr. Lisby's drug test. (Doc. 53-10, p. 70). Mr. Lisby tested positive for his prescribed amphetamine (Adderall) and methadone. (Doc. 53-10, p. 70). Dr. Daniel's office informed Tarkett that Mr. Lisby passed his drug test. (Doc. 53-4, pp. 12–13, tpp. 41–42, 47). So Ms. Burchell called Mr. Lisby and told him to attend orientation for the cycle counter position on May 19, 2015. (Doc. 53-4, p. 13, tp. 46).

Mr. Lisby attended orientation for the cycle counter position on May 19, 2015. (Doc. 53-10, p. 19, tpp. 70–72). That day, Ms. Burchell faxed to Dr. Daniel's office a cycle counter job description that was different from the one faxed to his office on May 13, 2015. (Doc. 53-4, p. 15, tp. 55; Doc. 60-12, p. 1). For the most part, this second job description listed similar duties as the first job description. But the second job description, unlike the first, included driving a forklift, and did not

include climbing stairs or working from heights. (Doc. 60-12, p. 1). Mr. Lisby is not aware of being shown either job description. (Doc. 53-10, p. 16, tp. 58).

After Ms. Burchell faxed him the new job description, Dr. Daniel called Ms. Burchell and told her that Mr. Lisby could not safely perform the cycle counter position because of the position's "safety sensitive duties." (Doc. 53-6, p. 5, ¶ 13). Dr. Daniel believed that Mr. Lisby could not safely work from heights or operate a forklift because of the effects of methadone. (Doc. 53-6, pp. 4–5, ¶ 11; Doc. 53-7, pp. 13, 18, 22, 26, 32–33, tpp. 48, 66–67, 81, 83, 97–100, 124–25). Dr. Daniel sent a form to Tarkett on which he marked that Mr. Lisby "[d]oes not meet the physical requirements listed in the job description" because, in Dr. Daniel's opinion, Mr. Lisby could not perform "safety sensitive work." (Doc. 53-6, p. 8).

After the phone call from Dr. Daniel, Ms. Burchell went to pull Mr. Lisby out of orientation. Mr. Lisby testified that Ms. Burchell went into the orientation room and told him in a "medium talk" in front of several others that Dr. Daniel would not permit him to work because he tested positive for amphetamines and methadone. (Doc. 53-10, pp. 20, 27, tpp. 73, 102–03). Ms. Burchell testified that Mr. Lisby then told her that he thought that Dr. Daniel was biased against him because they "had a previous litigation history with each other." (Doc. 53-4, p. 17, tp. 64). She told him that Tarkett would set up a second drug screen with another vendor. (Doc. 53-4, p. 18, tpp. 65–66). A second drug screen never occurred. (*See* Doc. 53-4, pp. 9–10,

tpp. 32–33).

Tarkett withdrew Mr. Lisby's job offer.  (Doc. 53-10, pp. 27–28, tpp. 103–05).

On August 26, 2015, Mr. Lisby filed an EEOC charge alleging disability discrimination and retaliation against Tarkett.  (Doc. 1-1, p. 1).  On September 20, 2016, the EEOC issued Mr. Lisby a notice of his right to sue.  (Doc. 1-2, p. 1).  This lawsuit followed.

Mr. Lisby asserts that Tarkett failed to hire him because of an actual or perceived disability; used his medical information in a manner inconsistent with the ADA; failed to interact with him when he sought an accommodation by requesting an evaluation from a doctor other than Dr. Daniel; and retaliated against him for alleging disability discrimination against Dr. Daniel in his prior EEOC charge filed against Lauderdale County.  (Doc. 20, pp. 6–9; *see* Doc. 62, pp. 14–28).

## III. Analysis

### A. <u>Disability Discrimination</u>

Mr. Lisby asserts that Tarkett failed to hire him because of an actual or perceived disability in violation of the ADA.  The ADA prohibits employers from discriminating "against a qualified individual on the basis of a disability" in any of the "terms, conditions, [or] privileges of employment." 42 U.S.C. § 12112(a).  In cases alleging disability discrimination, courts apply the burden-shifting analysis

established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  *Earl v. Mervyns, Inc.*, 207 F.3d 1361, 1365 (11th Cir. 2000).[2]

Pursuant to this framework, a plaintiff first must establish a *prima facie* case of disability discrimination.  *Mazzeo v. Color Resolutions Int'l, LLC*, 746 F.3d 1264, 1268 (11th Cir. 2014).  The *prima facie* case requires proof of three elements: (1) that the plaintiff "had a disability" when he suffered an "adverse employment action;" (2) "he was a qualified individual"; and (3) "he was subjected to unlawful discrimination because of his disability."  *Mazzeo*, 746 F.3d at 1268.  If the plaintiff satisfies his *prima facie* case, then the burden shifts to the defendant to articulate a legitimate nondiscriminatory reason for the adverse employment decision.  *Cleveland v. Home Shopping Network, Inc.*, 369 F.3d 1189, 1193 (11th Cir. 2004).  And then the burden shifts back to the plaintiff to demonstrate that the defendant's articulated reason is pretext for disability discrimination.  *Cleveland*, 369 F.3d at 1193.  The plaintiff succeeds at this step by showing that the defendant's articulated reason is "unworthy of credence."  *Cleveland*, 369 F.3d at 1193.

The ADA defines "disability" as (1) "a physical or mental impairment that substantially limits one or more major life activities of [an] individual"; (2) "a record of such an impairment"; or (3) "being regarded as having such an impairment."  42

---

[2] *McDonnell Douglas* burden-shifting does not apply to ADA discrimination claims based on a failure to provide a reasonable accommodation.  *Holly v. Clairson Indus., L.L.C.*, 492 F.3d 1247, 1262 (11th Cir. 2007).  So the Court will address separately Mr. Lisby's claim that Tarkett unlawfully discriminated against him by failing to reasonably accommodate his disability.

U.S.C. § 12102(1). The ADA provides that "major life activities include, but are not limited to, caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working." 42 U.S.C. § 12102(2)(A). The ADA provides also that an individual is "regarded as" having a disability "if the individual establishes that he or she has been subjected to an action prohibited under this chapter because of an actual or perceived physical or mental impairment whether or not the impairment limits or is perceived to limit a major life activity." 42 U.S.C. § 12102(3)(A). But an individual cannot be "regarded as" disabled based on a "transitory or minor" impairment, which the ADA defines as "an impairment with an actual or expected duration of 6 months or less." 42 U.S.C. § 12102(3)(B).

Under the second element of the *prima facie* case, the ADA defines a "qualified individual" as "an individual who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8).

Under the third element of the *prima facie* case, the ADA lists several examples of what constitutes proof that an individual "was subjected to unlawful discrimination because of his disability." *See* 42 U.S.C. § 12112(b). Relevant to Mr. Lisby's disability discrimination claim, the ADA defines as disability discrimination "limiting, segregating, or classifying a job applicant or employee in

a way that adversely affects the opportunities or status of such applicant or employee because of the disability of such applicant or employee." 42 U.S.C. § 12112(b)(1).

Here, under the first element of Mr. Lisby's *prima facie* case, a genuine dispute of material fact exists as to whether he has an actual disability under the ADA. Mr. Lisby suffers from ADHD, severe anxiety, and chronic lower back pain. Mr. Lisby and his wife testified that, without medication, his ADHD renders him unable to focus and makes it difficult to communicate his thoughts. (Doc. 60-14, p. 1, ¶ 3; Doc. 60-15, p. 1, ¶ 3). They both testified that his anxiety causes obsessive thoughts, rambling, fidgeting, sleeping problems, and panic attacks; he has panic attacks at least once a week. (Doc. 60-14, p. 2, ¶ 4; Doc. 60-15, p. 2, ¶ 4). Dr. Daniel assumed that Mr. Lisby's anxiety was "rather severe" because it caused panic attacks. (Doc. 53-7, p. 10, tp. 36). Mr. Lisby and his wife testified that his chronic lower back pain prevents him from standing or sitting in the same position for long periods of time, engaging in physical activity, and sleeping comfortably. (Doc. 60-14, p. 2, ¶ 5; Doc. 60-15, pp. 2–3, ¶ 5). Mr. Lisby was taking methadone regularly to manage his back pain. (Doc. 53-7, p. 31, tpp. 118–19).[3] This evidence could support a reasonable inference that Mr. Lisby's ADHD, severe anxiety, and chronic lower back pain each limits one or more of his major life activities, and therefore

---

[3] Dr. Daniel testified that taking long-term methadone is "a little overkill" for treating chronic pain; that generally, methadone is not used as a long-term painkiller; and that doctors generally prescribe opioids only on an acute, short-term basis. (Doc. 53-7, p. 31, tpp. 118–19).

creates a genuine dispute of material fact as to whether he has an actual disability.

Even if Mr. Lisby did not have an actual disability, he still would satisfy the first element of his *prima facie* case because a genuine dispute of material fact exists as to whether Tarkett regarded Mr. Lisby as having a disability. As stated above, an individual can state a *prima facie* case of discrimination based on a perceived disability regardless of whether the disability limits or is perceived to limit a major life activity. *See* 42 U.S.C. § 12102(3)(A). Here, Dr. Daniel knew that Mr. Lisby was taking prescribed amphetamine and methadone. (Doc. 53-6, pp. 4–5, ¶ 11; Doc. 53-10, p. 23, tpp. 85–86). Mr. Lisby reported to Dr. Daniel's nurse practitioner that he took prescribed Adderall for ADD, Klonopin for panic attacks, and methadone for back pain. (Doc. 53-6, pp. 3–4, ¶¶ 9.c, 9.d; Doc. 53-10, p. 68). Tarkett relied only on information from Dr. Daniel. And Mr. Lisby testified that Ms. Burchell told him that his drug test revealed amphetamine and methadone. (Doc. 53-10, p. 20, tp. 73). A reasonable jury could infer from this evidence that Tarkett perceived Mr. Lisby to have underlying disabling conditions that required him to take those medicines.

In arguing that no genuine dispute of material fact exists, Tarkett incorrectly states that Mr. Lisby relies on the side effects of methadone as his only actual or perceived disability. (*See* Doc. 55, p. 14) ("Even if his medication were uniquely necessary, his impairment cannot qualify because it is transitory. Lisby's claim here

is not based on some perceived disability for which he takes medication and is not based on perceived addiction; it is based on the medication's transitory effects when taken as prescribed.") (citations and emphasis omitted). But Mr. Lisby does not allege actual or perceived disability based only on the side effects of his medication; he alleges actual disability based on ADHD, severe anxiety, and chronic lower back pain, and perceived disability based on impairments requiring amphetamine and methadone.

Even so, a reasonable jury could find that, based on Dr. Daniel's opinion of Mr. Lisby's impairments caused by methadone, such impairments are not "transitory and minor," and therefore may constitute a perceived disability. Dr. Daniel testified that long-term opioid use could cause impaired motor skills, response time, and cognitive functioning, and that the severity of impairments could fluctuate day-to-day based on factors like sleep, food, and other medicines. (Doc. 53-7, pp. 24, 26, tpp. 91–92, 99). And the fact that Dr. Daniel recommended a total and immediate restriction of safety sensitive work, as opposed to a temporary restriction, supports a reasonable inference that Dr. Daniel considered methadone impairments to be non-minor and non-transitory. So Tarkett's perception of the impairments of Mr. Lisby's methadone use could be a perceived disability under the ADA.

Under the second element of Mr. Lisby's *prima facie* case, Tarkett contends that he was not a "qualified individual" under the ADA because he posed a direct

threat to his and others' safety as a cycle counter. (*See* Doc. 55, pp. 19–21). An individual who "pose[s] a direct threat to the health or safety of other individuals in the workplace" is not a qualified individual under the ADA. 42 U.S.C. § 12113(b); *see Waddell v. Valley Forge Dental Assocs., Inc.*, 276 F.3d 1275, 1284 (11th Cir. 2001) ("Waddell, because he is infected with the fatal, contagious disease of HIV, is a direct threat to his workplace, and therefore not a qualified individual under the ADA."). The ADA defines a "direct threat" as "a significant risk to the health or safety of others that cannot be eliminated by reasonable accommodation." 42 U.S.C. § 12111(3). An employer must decide whether an employee poses a direct threat "'based on a reasonable medical judgment that relies on the most current medical knowledge and/or the best available objective evidence,' and upon an expressly 'individualized assessment of the individual's present ability to safely perform the essential functions of the job,' reached after considering, among other things, the imminence of the risk and the severity of the harm portended." *Chevron U.S.A. Inc. v. Echazabal*, 536 U.S. 73, 86 (2002) (quoting 29 CFR § 1630.2(r)).

Here, evidence contradicts Tarkett's argument that Mr. Lisby posed a direct threat as a cycle counter. Tarkett reached its decision based only on Dr. Daniel's opinion. But Dr. Daniel did not examine Mr. Lisby or investigate whether Mr. Lisby actually exhibited impairments from taking methadone. Instead, Dr. Daniel opined that Mr. Lisby was a safety risk because Dr. Daniel generally considered all long-

term opiate users to pose an increased risk of injury. (Doc. 53-7, pp. 13–14, 18–19, tpp. 48–49, 66–67, 69–70). So a reasonable jury could doubt that Tarkett relied on the "best available objective evidence" or an "individualized assessment of [Mr. Lisby's] present ability to safely perform the essential functions of the [cycle counter] job" in deciding that he posed a direct threat. *See* 29 CFR § 1630.2(r); *Lowe v. Alabama Power Co.*, 244 F.3d 1305, 1309 (11th Cir. 2001) (finding that "particularized facts using the best available objective evidence as required by the regulations" did not support that an employee posed a direct threat because the employer relied in part on a doctor's "assumption that all double amputees have the same limitations," the doctor did not assess the employee's "actual capabilities through a physical examination or functionality test," and conducted only a "'cursory' examination of the employee").

On the other hand, Mr. Lisby's evidence shows that he was qualified for the cycle counter position and did not pose a direct threat. He had performed duties similar to, and some more hazardous than, those of a cycle counter at his previous jobs for several years while taking methadone; the methadone did not impair him. (*See* Doc. 60-15, p. 3, ¶¶ 6–7). So a genuine dispute of material fact exists as to whether Mr. Lisby posed a direct threat and whether he was a qualified individual under the ADA.

Mr. Lisby rounds out his *prima facie* case with evidence that Tarkett subjected

him to discrimination because of his actual or perceived disability. Tarkett revoked Mr. Lisby's job offer only because of Dr. Daniel's opinion. Dr. Daniel based his opinion on the effects of methadone, which, as explained above, could be a perceived disability. Evidence supports a reasonable inference that Tarkett knew of Mr. Lisby's actual disabilities (ADHD, severe anxiety, and chronic lower back pain) and perceived disabilities (conditions requiring Adderall and methadone, and impairments from methadone). (*See* Doc. 53-6, pp. 3–5, ¶¶ 9.c, 9.d, 11; Doc. 53-10, pp. 20, 23, tpp. 73, 85–86). And Tarkett prevented Mr. Lisby from working immediately after receiving Dr. Daniel's opinion. So a genuine dispute of material fact exists as to whether Tarkett discriminated against Mr. Lisby because of an actual or perceived disability, and Mr. Lisby has established a *prima facie* case of disability discrimination.

The burden now shifts to Tarkett to give a legitimate nondiscriminatory reason for failing to hire Mr. Lisby. The company has explained that it failed to hire him because Dr. Daniel said that Mr. Lisby could not perform safety sensitive work.

The burden now shifts back to Mr. Lisby to identify a genuine dispute as to whether Tarkett's explanation for failing to hire him is pretext for disability discrimination. His evidence of suspicious circumstances surrounding Tarkett's decision supports a reasonable inference of pretext. Ms. Burchell testified that Dr. Daniel's office told her that Mr. Lisby passed his drug test and was cleared to work

based on the first cycle counter job description sent to Dr. Daniel's office. (Doc. 53-4, pp. 12–13, tpp. 41–42, 47). That job description included "able to work from heights." (Doc. 53-10, p. 65). But, for reasons not clear from the record, Tarkett then provided Dr. Daniel a second job description that, unlike the first job description, included forklift work, which may reasonably be considered more hazardous. (Doc. 53-4, p. 15, tp. 55; Doc. 60-12, p. 1). The same day that he received the second job description, Dr. Daniel opined that, because Mr. Lisby's long-term methadone use impacted his (Mr. Lisby's) ability to "work at heights and operat[e] [] vehicles on the job," Mr. Lisby could not perform the Cycle Counter job. (Doc. 53-6, p. 4). So a reasonable jury could find suspicious Tarkett's sending Dr. Daniel the second job description. Also, Tarkett sent Mr. Lisby to Dr. Daniel for his drug test and physical even though Mr. Lisby told Ms. Burchell that he and Dr. Daniel had a history involving discrimination. And Dr. Daniel recommended a total prohibition on performing safety sensitive work without assessing Mr. Lisby's individualized impairments. A reasonable jury could find that this evidence casts doubt on Tarkett's explanation for terminating Mr. Lisby. So Mr. Lisby has shown a genuine dispute of material fact as to pretext, and the Court will deny summary judgment on his disability discrimination claim.

## B. Unlawful Medical Inquiry

Mr. Lisby brings an unlawful medical inquiry claim against Tarkett under the

ADA. He contends that Tarkett violated the ADA by "using [his] medical information in a manner inconsistent with the ADA and regulations." (Doc. 20, p. 7, ¶ 47).

The ADA provides a private right of action for a violation of the Act's preemployment medical examination rules. *Harrison v. Benchmark Elecs. Huntsville, Inc.*, 593 F.3d 1206, 1213 (11th Cir. 2010). One of these rules is that an employer "may condition an offer of employment on the results of [a preemployment medical] examination, if . . . information obtained regarding the medical condition or history of the applicant is . . . treated as a confidential medical record, except that . . . supervisors and managers may be informed regarding necessary restrictions on the work or duties of the employee. . . ." 42 U.S.C. § 12112(d)(3)(B)(i).

Mr. Lisby contends that Tarkett violated this confidentiality rule because he asserts that Ms. Burchell communicated the results of his drug test in the presence of others. (Doc. 62, p. 7, ¶ 17).[4] He testified that Ms. Burchell told him in a "medium talk" in front of several non-supervisor employees at the orientation that

---

[4] In his second amended complaint, Mr. Lisby also alleged that "medical information obtained by defendants was improperly used to screen out plaintiff, and the criteria applied by defendants was not job-related and consistent with business necessity." (Doc. 20, p. 7, ¶ 46). By omitting this allegation from his brief in response to Tarkett's motion for summary judgment, he has abandoned this aspect of his unlawful medical inquiry claim. *See Cole v. Owners Ins. Co.*, 326 F. Supp. 3d 1307, 1329 (N.D. Ala. 2018) ("[G]rounds alleged in a complaint, but ignored at summary judgment are abandoned. [*Resolution Trust Corp. v. Dunmar Corp.*, 43 F.3d 587, 599 (11th Cir. 1995)]. The court finds that the Coles abandoned any suppression- or deceit-based fraud theory by failing to advance a relevant argument in response to Owners's motion for summary judgment. [*Id.*])."

Dr. Daniel would not permit him to work because he tested positive for amphetamines—she may have said "methamphetamines"—and methadone. (Doc. 53-10, pp. 20, 27, tpp. 73, 102–03).[5] On the other hand, Ms. Burchell testified that she pulled Mr. Lisby out of the orientation room, shut the door to the room behind them, and communicated with him in the hallway where nobody could overhear them. (Doc. 53-4, p. 17, tpp. 63–64). The alternative versions of this event create a genuine dispute of material fact as to whether Ms. Burchell breached the confidentiality of the results of Mr. Lisby's drug test.

Tarkett contends that Mr. Lisby's medical inquiry claim nevertheless fails because, according to the company, he has no evidence of damages that he suffered as a result of any breach of confidentiality. (Doc. 55, pp. 22–23). But Mr. Lisby has evidence that he suffered emotional distress from the breach, and emotional damages can support a medical inquiry claim. *See Russell v. City of Mobile Police Dep't*, 552 Fed. Appx. 905, 907 (11th Cir. 2014) (citing *Harrison v. Benchmark Elecs. Huntsville, Inc.*, 593 F.3d 1206, 1216–17 (11th Cir. 2010)). Mr. Lisby testified that, after Tarkett revoked his job offer, his neighbor asked him if he took drugs; a former Tarkett employee worked for that neighbor. (Doc. 53-10, p. 32, tp. 123). Several

---

[5] Tarkett contends that the Court cannot consider this testimony on summary judgment because it is hearsay. (Doc. 55, pp. 22–23). But a district court may consider summary judgment evidence that may be reduced to admissible form at trial. *Macuba v. Deboer*, 193 F.3d 1316, 1323 (11th Cir. 1999). Mr. Lisby may avoid a hearsay objection at trial by calling Ms. Burchell as a witness, so the Court will consider Mr. Lisby's testimony.

Tarkett employees that live in Mr. Lisby's neighborhood now know that he took drugs. (Doc. 53-10, p. 32, tp. 122). He now feels stigmatized for using methadone. (Doc. 53-10, p. 32, tp. 123; Doc. 60-15, p. 2, ¶ 5). The stigma causes him anxiety and prevents him from taking methadone again. (Doc. 53-10, p. 32, tp. 123; Doc. 60-15, p. 2, ¶ 5). A reasonable jury could infer from this evidence that Mr. Lisby suffered injury from word—and possibly misinformation—getting out about his drug use. So the Court will deny summary judgment as to Mr. Lisby's medical inquiry claim.

### C.     Failure to Accommodate

Next, Mr. Lisby contends that Tarkett unlawfully discriminated against him by failing to provide a reasonable accommodation for his disability. An employer unlawfully discriminates against a qualified individual with a disability by "not making reasonable accommodations to the known physical or mental limitations of [the individual], unless [the employer] can demonstrate that the accommodation would impose an undue hardship on the operation of the business of [the employer]." 42 U.S.C. § 12112(b)(5)(A). To succeed on a failure to accommodate claim, a plaintiff must show that he had a disability, was a qualified individual under the ADA, and was denied a reasonable accommodation. *Holly*, 492 F.3d at 1256, 1262. The plaintiff bears the burden to identify an accommodation he was denied and prove that the accommodation would have been reasonable. *Willis v. Conopco, Inc.*, 108

F.3d 282, 284 (11th Cir. 1997). "An accommodation is 'reasonable' and necessary under the ADA only if it enables the employee to perform the essential functions of the job." *Lucas v. W.W. Grainger, Inc.*, 257 F.3d 1249, 1259–60 (11th Cir. 2001). But the employer's duty to provide a reasonable accommodation does not arise unless the employee makes a "specific demand for an accommodation." *Gaston v. Bellingrath Gardens & Home, Inc.*, 167 F.3d 1361, 1363 (11th Cir. 1999).

Here, the record construed in the light most favorable to Mr. Lisby supports a reasonable inference that he made a specific demand for an accommodation when he asked to see a doctor other than Dr. Daniel. Mr. Lisby testified that, before his preemployment physical and drug test, he told Ms. Burchell that he "may have trouble" with Dr. Daniel because of an "ongoing dispute" with Dr. Daniel concerning discrimination, and something "pending . . . like an investigation" against Dr. Daniel that could cause a "future problem," have "legal ramification[s]," and "could judge negatively towards [Mr. Lisby]." (Doc. 53-10, pp. 20, 27, tpp. 73–75, 101–02). He repeated his request to see a different doctor after Ms. Burchell informed him that Dr. Daniel prohibited him from working. (Doc. 53-7, p. 25, tp. 94; *see* Doc. 53-4, pp. 17–18, tpp. 64–66). A reasonable jury could find that Mr. Lisby requested a second unbiased opinion as the only way to keep his job in the face of a disability-based decision to revoke his job offer; after all, Tarkett relied only on Dr. Daniel's opinion in deciding to revoke Mr. Lisby's job offer. So a

genuine dispute of material fact exists as to whether Mr. Lisby requested an accommodation. *See Moore v. Computer Scis. Corps.*, 2017 WL 3873777, at *9 (N.D. Ala. Sept. 5, 2017) (finding a genuine dispute of material fact as to whether a plaintiff made a specific demand for a reasonable accommodation by withdrawing her leave request because she would likely lose her job if she did not).

Also, evidence supports a reasonable inference that permitting Mr. Lisby to see another doctor would have been a reasonable accommodation. Mr. Lisby took methadone without issue under a doctor's care during his prior employment with Lauderdale County and Freight Car where he performed safety sensitive work. (Doc. 60-15, p. 3, ¶¶ 6–7). So reasonable jurors could find that a second evaluation would enable Mr. Lisby to perform the essential functions of the cycle counter position. And he volunteered to pay for another evaluation, so Tarkett would suffer no hardship. Because Mr. Lisby has shown a genuine dispute of material fact as to whether he requested an accommodation, whether that accommodation was reasonable, and whether Tarkett denied him that accommodation, the Court will deny summary judgment as to Mr. Lisby's failure to accommodate claim.

### D. <u>Retaliation</u>

Finally, Mr. Lisby contends that Tarkett did not hire him because he filed an EEOC charge alleging disability discrimination against Lauderdale County that involved Dr. Daniel. The ADA provides that "[n]o person shall discriminate against

any individual because such individual has opposed any act or practice made unlawful by [the ADA] or because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under [the ADA]." 42 U.S.C. § 12203(a). The *McDonnell Douglas* burden-shifting analysis applies to ADA retaliation claims. *Stewart v. Happy Herman's Cheshire Bridge, Inc.*, 117 F.3d 1278, 1287 (11th Cir. 1997). "To establish a *prima facie* case of retaliation, a plaintiff must show: (1) statutorily protected expression; (2) adverse employment action; and (3) a causal link between the protected expression and the adverse action." *Stewart*, 117 F.3d at 1287. "To prove a causal connection, [the Eleventh Circuit] require[s] a plaintiff only to demonstrate that the protected activity and the adverse action were not wholly unrelated." *Farley v. Nationwide Mut. Ins. Co.*, 197 F.3d 1322, 1337 (11th Cir. 1999) (internal quotations and emphasis omitted). A plaintiff can show a causal link with proof that "the decision-maker became aware of the protected conduct, and that there was close temporal proximity between this awareness and the adverse employment action." *Farley*, 197 F.3d at 1337. Temporal proximity must be "very close" to raise a genuine issue of causation on its own. *Thomas v. Cooper Lighting, Inc.*, 506 F.3d 1361, 1364 (11th Cir. 2007).

If the plaintiff establishes his *prima facie* case, then the burden shifts to the defendant to articulate a legitimate nonretaliatory reason for the adverse action. *Stewart*, 117 F.3d at 1287. Then the burden shifts back to the plaintiff to

"demonstrate that [he] will be able to establish at trial that the employer's proffered non-discriminatory reasons are a pretextual ruse designed to mask retaliation." *Stewart*, 117 F.3d at 1287.

Here, Mr. Lisby engaged in statutorily protected expression by filing an EEOC charge against Lauderdale County, and he suffered an adverse employment action when Tarkett revoked his conditional job offer. But Tarkett contends that no evidence supports an inference of a causal link between Mr. Lisby's EEOC charge and the company's decision. The Court disagrees.

A reasonable jury could infer that Tarkett was aware of Mr. Lisby's EEOC charge, or believed he was engaged in comparable protected activity, because of his conversations with Ms. Burchell. Sometime around May 13, 2015, he told Ms. Burchell that he had an ongoing dispute concerning discrimination against Dr. Daniel that could have legal ramifications. (Doc. 53-10, p. 27, tp. 101). Ms. Burchell told him on May 19, 2015 that Dr. Daniel prohibited him from working. A reasonable jury could find "very close" temporal proximity between these two conversations, so the temporal proximity is by itself sufficient to satisfy the causation element of Mr. Lisby's *prima facie* case. *See Thomas*, 506 F.3d at 1364.

The burden now shifts to Tarkett to articulate a legitimate nonretaliatory reason for revoking Mr. Lisby's job offer. As it did in response to Mr. Lisby's discrimination claim, Tarkett explains that it revoked his job offer because Dr.

Daniel opined that he could not perform safety sensitive work. The Court, in the context of Mr. Lisby's discrimination claim, has found that his evidence casts reasonable suspicion on Tarkett's explanation and raises a genuine dispute of material fact as to pretext. So the Court will deny summary judgment as to Mr. Lisby's retaliation claim.

## IV. Conclusion

For the foregoing reasons, the Court denies Tarkett's motion for summary judgment. The Court will set this case for a pretrial conference by separate order.

The recent General Order Regarding Court Operations During the Public Health Emergency Caused by the COVID-19 Virus (N.D. Ala. Mar. 17, 2020) does not affect the deadline to challenge a final order or judgment on appeal. *See* https://www.alnd.uscourts.gov/general-order-regarding-court-operations-during-public-health-emergency-caused-covid-19-virus, p. 2, ¶ 7. The parties are reminded that under Rule 4(a)(5) of the Federal Rules of Appellate Procedure, a party may request an extension of time for a notice of appeal. In addition, pursuant to Rule 4(a)(6), a party may ask a district court to reopen the time to file a notice of appeal for 14 days. Parties are advised to study these rules carefully if exigent circumstances created by the COVID-19 Public Health Emergency require motions under FRAP 4(a)(5) or 4(a)(6).

**DONE** and **ORDERED** this 31st day of March, 2020.

**MADELINE HUGHES HAIKALA**
UNITED STATES DISTRICT JUDGE